**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AEGIS CAPITAL CORP.,

*Plaintiff,*

v.

JUPITER WELLNESS, INC.,

*Defendant.*

No. _____

## COMPLAINT

Aegis Capital Corp. ("Aegis"), by counsel, for its complaint against Jupiter Wellness, Inc.

("Jupiter Wellness" or the "Company"), states as follows:

### Nature of Action

1.      This is a breach of contract action.  Aegis entered into a written Underwriting

Agreement dated July 21, 2021 (the "Underwriting Agreement") with the defendant, Jupiter

Wellness, for the issuance of certain securities of Jupiter Wellness to the public (the "JUPW

Offering").  As part of the Underwriting Agreement, Jupiter Wellness expressly agreed to a lock-

up period ("Lock-Up Period") from July 21, 2021 to July 20, 2022, during which it would not

offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or

contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose

of, directly or indirectly, any shares of capital stock of the Company or any securities convertible

into or exercisable or exchangeable for shares of capital stock of the Company; or file or cause to

be filed any registration statement with the Securities Commission relating to the offering of any

shares of capital stock of the Jupiter Wellness or any securities convertible into or exercisable or

exchangeable for shares of capital stock of Jupiter Wellness or any resale registration statement.

2.      The Lock-Up Period was very important to Aegis as it affects its business and other

offerings.  The Lock-Up Period was an essential and bargained for part of the Underwriting

Agreement and the JUPW Offering. Based on Jupiter Wellness' agreement to be bound by the Lock-Up Period and other terms of the Underwriting Agreement, Aegis undertook, on a firm commitment basis, to purchase from Jupiter Wellness and certain of its shareholders (each of which shareholders was an officer and/or director of Jupiter Wellness) an aggregate of 11,607,142 shares of common stock and 11,607,142 warrants to purchase shares of common stock of Jupiter Wellness, resulting in gross proceeds to Jupiter Wellness and such shareholders of $32,499,997.60 for the firm commitment JUPW Offering.

3.      Despite acknowledging and agreeing to this express and unambiguous provision, Jupiter Wellness has on several occasions during the unexpired Lock-Up Period willfully and blatantly breached the Underwriting Agreement by purposely taking prohibited actions, including the issuance of securities, the filing of a registration statement to register such securities and underlying shares of common stock of Jupiter Wellness and proceeding to cause such registration statement to be declared effective by the SEC. Jupiter Wellness' purposeful and knowing breaches of the Underwriting Agreement have caused and continue to cause Aegis substantial and irreparable harm for which monetary damages are insufficient to remedy.

4.      As a result, Aegis requests that this court order rescission of the agreements, promissory notes, warrants and options executed in violation of the Underwriting Agreement and further requests that this court enjoin Jupiter Wellness from any further breach of the Underwriting Agreement and, in particular, from (i) taking any actions to maintain the effectiveness of the Registration Statement effective; (ii) effecting any issuance of shares of common stock under (a) the Violating Transactions, including any exercise of options or warrants or any conversion of promissory notes into shares of common stock or (b) otherwise in violation of the Lock-Up Period and the Underwriting Agreement; (iii) effecting, permitting or registering any transfer of the

Violating Transactions (including promissory notes, warrants or options) to third parties on the books of Jupiter Wellness or its transfer agent.  Aegis further requests that this court require Jupiter Wellness to specifically perform under the Underwriting Agreement and provide an equitable extension of the Lock-Up Period to ensure that Aegis has the benefit of a full one (1) year of Lock-Up Period, plus such additional time as the court may deem appropriate to remedy periods of breach of the Lock-Up Period. Aegis also seeks an award of its monetary damages in an amount proven at trial, along with all its attorneys' fees and costs as provided under the Underwriting Agreement.

**The Parties**

5.     Aegis is a duly organized New York corporation with a principal place of business located at 1345 Avenue of the Americas, 27th Floor New York, NY 10105. Aegis is an investment bank and wealth management firm that is a registered broker-dealer with the U.S. Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority ("FINRA"). Aegis regularly assists public and private companies with their capital raising, corporate finance and corporate advisory needs.

6.     Jupiter Wellness is a duly organized Delaware corporation with a principal place of business located at 1061 E. Indiantown Road Suite 110 Jupiter FL 33477.  Jupiter Wellness states on its website that it "translates innovative health science into revolutionary products aimed at skin, hair, sexual wellness, and general health." https://jupiterwellness.com/#. The common stock and warrants of Jupiter Wellness trade on the Nasdaq Capital Market under the symbols "JUPW" and "JUPWW", respectively.

**Jurisdiction and Venue**

7.       This Court has jurisdiction under 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.  Venue is proper under 28 U.S.C. § 1391.

8.       In addition, because this action arises out of and relates to the Underwriting Agreement, Jupiter Wellness has consented expressly and waived all objections to the exclusive jurisdiction and venue of this Court pursuant to Section 9.6 of that Agreement:

> *9.6. Governing Law; Consent to Jurisdiction; Trial by Jury.* This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to conflict of laws principles thereof. The Company hereby agrees that any action, proceeding or claim against it arising out of, or relating in any way to this Agreement shall be brought and enforced in the New York Supreme Court, County of New York, or in the United States District Court for the Southern District of New York, and irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive. The Company hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum.

9.       As set out in the preceding paragraph, the Underwriting Agreement was entered into in and is governed by New York law.  The cause of action arises from the breach of the Underwriting Agreement, and this Court has jurisdiction to adjudicate Aegis' claims against Jupiter Wellness under the New York Long Arm Statute.

**Facts**

10.       On July 21, 2021, Aegis entered into the Underwriting Agreement with the defendant, Jupiter Wellness for, among other things, the issuance of certain stock to the public. The Underwriting Agreement is publicly filed with the Securities and Exchange Commission (See Exhibit 10.1 to Form 8-K filed July 30, 2021) and described in both the final prospectus filed on July 23, 2021 (as supplemented on July 26, 2021) and the current report on Form 8-K filed July 30, 2021.  A copy of the Underwriting Agreement is attached as **Exhibit 1**.

11.     As part of that agreement, and as an express provision provides, Jupiter Wellness agreed to the Lock-Up Period under Section 3.17 of that agreement.   The Lock-Up Period provision provided:

*3.17. Company Lock-Up*. The Company, on behalf of itself and any successor entity, agrees that, without the prior written consent of the Representative, it will not, <u>for a period of one (1) year from the date of the Offering (the "**Lock-Up Period**"), (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for shares of capital stock of the Company; or (ii) file or cause to be filed any registration statement with the Commission relating to the offering of any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for shares of capital stock of the Company or any resale registration statement.</u> The prior sentence will not apply to (i) the shares to be sold pursuant to the Underwriting Agreement, (ii) such issuances of options or grants of restricted stock or other equity-based awards to employees, directors and officers of the Company under the Company's equity incentive plans and the issuance of shares issuable upon exercise of any such equity-based awards, (iii) the filing of registration statements on Form S-8, and (iv) the issuance of shares in connection with an acquisition or a strategic relationship approved by a majority of the disinterested directors of the Company which may include the sale of equity securities; provided, that none of such shares shall be saleable in the public market until the expiration of the one (1) year period described above pursuant to a written lock-up agreement with the Company and provided that any such issuance shall only be to a Person (or to the equityholders of a Person) which is, itself or through its subsidiaries, an operating company or an owner of an asset in a business synergistic with the business of the Company and shall provide to the Company additional benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

[Emphasis added.] The Lock-Up Period was an essential and bargained for part of the Underwriting Agreement.   The period is necessary and important to Aegis as it affects its business with Jupiter Wellness and affects the company's other securities offerings.   Aegis requires these Lock-Up Periods in its Underwriting Agreements as a condition of undertaking the obligations of an underwriter in a firm commitment offering: to wit, the primary obligation to purchase securities of the issuer prior to reselling to the public.

12.     Moreover, the Lock-Up period was essential to the JUPW Offering because it afforded Aegis the power to protect its clients' investments in Jupiter Wellness common stock and warrants for one (1) year following the JUPW Offering. Any issuances or threatened issuances of shares of Jupiter Wellness common stock or other securities exercisable or convertible for such stock (a) pose an immediate harm to such Aegis investors as to the immediate dilution caused by such issuance, (b) affect the financial statements of Jupiter Wellness, and (c) introduce the risk of future dilution in connection with the future conversion of promissory notes or exercise of warrants or options, particularly as here where such securities have anti-dilution protection. Aegis' investors placed faith in Aegis' commitment to hold Jupiter Wellness to the agreed Lock-Up Term of the Underwriting Agreement as a key factor in their decisions to invest in the JUPW Offering.

13.     As noted above, the JUPW Offering resulted in gross proceeds to Jupiter Wellness and the selling shareholders of $32,499,997.60. According to Jupiter Wellness' Registration Statement, as of June 10, 2022 the Company had 24,396,001 shares of common stock issued and outstanding. The official closing price of such common stock on the Nasdaq Capital Market on June 22, 2022 was $0.8142 per share, resulting in an aggregate market capitalization of $19,863,224.01 on such date, significantly lower than even just the amount invested by Aegis' clients less than one year earlier. Given such risks, it is critical for Aegis to have a full year Lock-Up Period to remain in position to protect its clients' investment interests.

14.     Despite acknowledging and agreeing to this express, unambiguous and bargained-upon provision, Jupiter Wellness has on several occasions during the unexpired Lock-Up Period willfully and blatantly breached the Underwriting Agreement by purposely taking prohibited actions during the Lock-Up Period.

15.     In particular, Jupiter Wellness has, among other things, expressly violated the agreement by:

- On April 20, 2022, Jupiter Wellness entered into convertible promissory loans and warrants in the aggregate amounts of $1,500,000 with Greentree Financial Group ("Greentree") and $500,000 with L&H, Inc. ("L&H").

- On May 20, 2022, the Company entered into a consulting agreement with Wall and Broad Capital, LLC ("W&B"), pursuant to which it was obligated to grant an initial award of 300,000 options and a Performance Fee for investments, licensing agreements and distribution agreements, which Performance Fee may be paid in "registered and freely-traded shares of the Company" at W&B's option; and

- On June 13, 2022, the Company filed a registration statement (the "Registration Statement") on Form S-3 (SEC No. 333-265561) to register the resale of up to 6,830,538 shares of its common stock in connection with the Greentree, L&H and W&B transactions. Importantly, the Company engaged the same law firm to prepare such Registration Statement as it engaged in connection with the JUPW Offering and Underwriting agreement.

- In spite of actual oral and written notice of breach of the Underwriting Agreement from Aegis, Jupiter Wellness caused the Registration Statement to be declared effective by the SEC on June 22, 2022. Jupiter Wellness filed an acceleration request and took no actions to stay or withdraw that request.

(collectively, "Violating Transactions").  Each of these Violating Transactions was completed during the unexpired Lock-Up Period and in violation of the Underwriting Agreement.

16.     The Company did not approach Aegis prior to any of the Violating Transactions to seek Aegis' consent or waiver, and at no point did Aegis provide any waiver of the Lock-Up Period.

17.     By entering the Violating Transactions, Jupiter Wellness has harmed Aegis' relationships with its clients, which purchased shares of common stock and warrants in the JUPW Offering on the belief that Jupiter Wellness would not conduct any further issuances of securities (other than as expressly permitted by the Lock-Up) for one (1) year following the JUPW Offering unless such future offering was waived in advance by Aegis.

18.     The terms of the Violating Transactions were on terms that were more favorable to each of Greentree, L&H and W&B than the terms provided by the Company to investors in the JUPW Offering, to the detriment of Aegis' investors. The JUPW Offering consisted of one share of common stock and one warrant to purchase one share of common stock for a purchase price of $2.80. The exercise price of the warrants in the JUPW Offering was fixed at $2.80 and was not subject to adjustment in the event of any future issuance at a lower price.

19.     Greentree and L&H transactions were substantially identical and consisted of promissory notes and warrants. The Greentree and L&H promissory notes (a) bear interest at 8% per year, (b) feature a 5% original issuance discount, (c) are convertible at $2.79 per share, (d) are subject to an adjustment of exercise price to $1.00 per share in the event of any default, (e) provide for penalties of 2% per month for certain defaults and (f) bear interest at 18% following any event of default. The Greentree and L&H warrants (x) are initially exercisable at $2.79 per share, (y) provide for a reduction in exercise price in the event Jupiter Wellness grants, issues or sells common stock or securities exercisable or convertible for common stock for a lower price than the then-current exercise price of such warrants and (z) does not provide for any adjustment of exercise price or number of shares in the event of any reverse stock split.

20.     The lower initial conversion/exercise price of the Greentree and L&H securities as compared to the JUPW Offering, when viewed in combination the above features, are on significantly more favorable terms to each of Greentree and L&H than the terms received by the investors in the JUPW Offering, to the detriment of Aegis' clients.

21.     The W&B transaction consisted of an issuance of options to purchase 300,000 shares of Jupiter Wellness common stock for an exercise price of $1.00 per share. No value is ascribed to the W&B options in the consulting agreement with W&B, but Jupiter Wellness' public

filings do not disclose any payment made by W&B for such options and instead suggest that such grant of options is for consulting services and not for payment.

22.     The lower exercise price of the W&B option as compared to the JUPW Offering warrant demonstrates that the terms of such W&B option are on more favorable terms to W&B than Jupiter Wellness provided in the JUPW Offering warrants, which feature an exercise price more than two times higher, $2.79 per share. Aegis' clients are thus harmed by being unable to benefit from such terms and, moreover, by creating option holders that would be able to profit when Jupiter Wellness' stock trades at a lower price per share, thereby resulting in further dilution and exerting negative pressure on the stock price.

23.     Jupiter Wellness' breach of Aegis' Lock-Up deprived Aegis of the ability to protect its investors by, for example, (a) as to Greentree and L&H, removing the original issuance discount from the notes, requiring lower initial and default interest rates for the notes, setting a floor on a dilutive issuance adjustment to the warrants or requiring adjustments to the number of warrants and exercise price in the event of a reverse split of common stock, or and (b) as to W&B, insisting that the W&B options have a higher exercise price or that W&B receive fewer options for services to be provided.

24.     Aegis relies on its clients' trust to conduct its business; in the absence of confidence in Aegis' efforts to protect them, such investors are less likely to invest in Aegis' offerings. Moreover, because Jupiter Wellness did not seek or obtain a waiver or consent from Aegis, Aegis was deprived of the opportunity to help its clients mitigate the negative effect of these subsequent transactions on Aegis' clients by providing alternative financing options that would be beneficial to Aegis' clients or possibly to allow them to participate in a proposed financing. Thus, this breach

is impossible to remedy with only monetary damages and requires rescission of the Violating Transactions and other equitable remedies described herein.

25.     At the time of the Violating Transactions, Jupiter Wellness was aware of its continued obligations under the Underwriting Agreement with Aegis.

26.     The Greentree and L&H transactions specifically reference a binding contractual relationship with Aegis. Section 10(d) of the Loan Agreements with each of Greentree and L&H explicitly acknowledge an existing relationship with Aegis that remained in effect as of the date of such Loan Agreements:

> d. Except with respect to Aegis Capital Corp., a registered broker-dealer located in the State of New York, Lender has no contract, arrangement or understanding with any broker, finder, investment bank, financial intermediary or similar agent with respect to any of the transactions contemplated by this Agreement.

27.     Section 10(d) is stated as a representation of each Lender (i.e., Greentree and L&H); however, Aegis did not have any agreement with either Greentree or L&H with regard to such parties' loan agreement, promissory note or warrants with Jupiter Wellness. Nevertheless, the representation demonstrates that Jupiter Wellness and each of Greentree and L&H were actually aware of Aegis' interest "with respect to any of the transactions contemplated by this Agreement."

28.     As noted above, the Underwriting Agreement is a publicly filed document that is also referenced in other publicly filed reports and the JUPW Offering prospectus. It is readily available for free on the SEC's EDGAR website; all parties have had easy access to read the Underwriting Agreement at any point. Nothing about the Underwriting Agreement is hidden or difficult to access.

29.     Based on the foregoing, on information and belief, each of the parties to the Violating Transactions was on notice of Aegis' position with regard to Jupiter Wellness, both by virtue of multiple filings with the SEC by Jupiter Wellness that describe the Lock-Up Period and

also by virtue of the Loan Agreements that each of such entities negotiated and entered with Jupiter Wellness. To the extent discovery in the instant case evidences cooperation between Jupiter Wellness and any of Greentree, L&H or W&B to tortiously interfere with Aegis' contractual relationship with Jupiter Wellness, Aegis intends to add each of such parties as additional parties to this complaint.

30.     On or about June 1, 2022, the Chief Executive Officer of Jupiter Wellness disclosed to Aegis its earlier entry into the Greentree and L&H transactions. Aegis proposed completion of a private capital raise that included investors from the July 21, 2021 underwritten offering as a way to protect such Aegis clients' interest; however, Aegis and Jupiter Wellness did not reach any agreement about such a private capital raise. At no point did Aegis consent to or waive any of its rights with respect to the already-completed Violating Transactions.

31.     After this conversation, Jupiter Wellness proceeded to file the Registration Statement on June 13, 2022, in further knowing violation of the Lock-Up Period of the Underwriting Agreement. In preparing the Registration Statement, Jupiter Wellness retained the same law firm that represented Jupiter Wellness in connection with the JUPW Offering. Jupiter Wellness and such counsel specifically negotiated the Lock-Up Period with Aegis in the JUPW Offering and so were aware that the Lock-Up Period had not expired at the time of the filing of the Registration Statement, not to mention the Greentree, L&H and W&B transactions. In addition, Jupiter Wellness had actual and recent knowledge (within the prior two weeks) that Aegis had not provided any consent or waiver of the Lock-Up Period.

32.     On June 17, 2022, Aegis' counsel called the counsel of record on the Registration Statement and advised such counsel that Jupiter Wellness was in breach of the Underwriting Agreement and that Aegis would be sending written notice of breach. By letter dated June 20,

2022, Aegis provided such written notice of, and requested Jupiter Wellness to cease and desist from the listed breaches of, the Underwriting Agreement.  Upon receipt of such notice, Jupiter Wellness directed Aegis to discuss the matter with counsel at another law firm, who would be handling the matter. To date, Jupiter Wellness has not remedied any such breaches, including by filing a withdrawal of the Registration Statement.  A copy of the June 20, 2022 letter is attached as **Exhibit 2**. Jupiter Wellness did not refrain from further breaches of the Underwriting Agreement; to the contrary, it filed an acceleration request with the SEC to seek to have the Registration Statement declared effective. Jupiter Wellness was on notice that Aegis would be irreparably harmed "if the Registration Statement is declared effective and any shares underlying the Registration Statement are sold to the public" and that Aegis would seek judicial intervention to protect itself against such harm. At any point prior to effectiveness, Jupiter Wellness could have filed a one-page request to stay the effectiveness of the Registration Statement, and it did not take any such action. For this reason, Aegis seeks immediate relief to avoid the further irreparable harm that would be caused by the effectiveness of the Registration Statement and risk that any registered shares are issued to the public market.

33.     Jupiter Wellness' purposeful and knowing breaches of the Underwriting Agreement have caused and continue to cause Aegis substantial harm in excess of $75,000 as well as irreparable harm to its business.  As a result of this monetary and ongoing irreparable harm, Aegis requests that this court order rescission of the Greentree, L&H and W&B transactions and enjoin Jupiter Wellness from any further breach of the Underwriting Agreement and, in particular, from (i) taking any actions to maintain the effectiveness of the Registration Statement; (ii) effecting any issuance of shares of common stock under the Violating Transactions, including any exercise of options or warrants or any conversion of promissory notes into shares of common

stock; (iii) effecting, permitting or registering any transfer of the Violating Transactions (including promissory notes, warrants or options) to third parties on the books of Jupiter Wellness. Aegis further requests that this court require specific performance of the Underwriting Agreement and provide an equitable extension of the Lock-Up Period to ensure that Aegis has the benefit of a full one (1) year of Lock-Up Period, plus such additional time as the court may deem appropriate to remedy periods of breach of the Lock-Up Period.

34.     Aegis also seeks an award of its monetary damages in an amount proven at trial, along with all its attorneys' fees and costs as provided under Section 9.6 of the Underwriting Agreement, which provides in part:

> The Company agrees that the prevailing party(ies) in any such action shall be entitled to recover from the other party(ies) all of its reasonable attorneys' fees and expenses relating to such action or proceeding and/or incurred in connection with the preparation therefor.

## First Cause of Action (Equitable Relief)

35.     Aegis repeats and incorporates the foregoing allegations as if restated in full in this paragraph.

36.     The Underwriting Agreement is valid and enforceable agreement formed by the parties under New York law that Aegis has dutifully performed in good faith.

37.     The Lock-Up Period is a valid and enforceable term of the Underwriting Agreement.

38.     The Underwriting Agreement permits the recovery of reasonable attorneys' fees and expenses to the prevailing party in any action necessary to enforce the terms of the Underwriting Agreement.

39.     Aegis did not provide a written consent or waiver to Jupiter Wellness to enter into any of the Violating Transactions.

40.     Jupiter Wellness violated the Underwriting Agreement by entering into the Greentree loan agreement, promissory note and warrant without obtaining Aegis' consent or waiver.

41.     Jupiter Wellness violated the Underwriting Agreement by entering into the L&H loan agreement, promissory note and warrant without obtaining Aegis' consent or waiver.

42.     Jupiter Wellness violated the Underwriting Agreement by entering into the W&B consulting agreement and option agreement without obtaining Aegis' consent or waiver.

43.     Jupiter Wellness violated the Underwriting Agreement by filing the Registration Statement to register the common stock underlying the Greentree promissory note and warrants, L&H promissory note and warrants and W&B options, all without obtaining Aegis' consent or waiver. Jupiter Wellness further violated the Underwriting Agreement by filing an acceleration request that caused the Registration Statement to be declared effective by the SEC effective June 22, 2022.

44.     As a direct and proximate cause of Jupiter Wellness' multiple blatant breaches of the Underwriting Agreement, Aegis has suffered irreparably injury because Aegis has not been able to protect its investors in the JUPW Offering from the dilutive effect of the Greentree, L&H and W&B transactions.

45.     Because the Greentree and L&H promissory notes and warrants and the W&B options contain complex terms that remain subject to adjustment based on external future actions (e.g., reverse stock splits, future breaches and future dilutive issuances), a monetary remedy is both difficult if not impossible to quantify and also insufficient to remedy the injury to Aegis and its investors' relationship with Aegis.

46.     Jupiter Wellness' multiple breaches of the Underwriting Agreement by entering the Violating Transactions were material and willful or so substantial and fundamental to the Underwriting Agreement that they defeated the purpose of the parties in entering into the Underwriting Agreement.

47.     There is no adequate remedy at law.

48.     Given the clear and blatant breach of the Underwriting Agreement, there is a substantial likelihood that Aegis will succeed on the merits of its claim; there is clear irreparable injury that has occurred from such actions which irreparable injury will continue in the absence of an injunction; the threatened injury to Aegis outweighs any harm to Jupiter Wellness resulting from an order enjoining further breach of that agreement; and an injunction is in the public interest.

49.     Aegis seeks equitable relief as to each of the Violating Transactions, including, to wit: (a) rescission of the Greentree loan agreement, promissory note and warrant; (b) rescission of the L&H loan agreement, promissory note and warrant; (c) rescission of the W&B option agreement and, to the extent it requires issuance of securities, the W&B consulting agreement; and (d) equitable relief to enjoin Jupiter Wellness from taking any actions to maintain the effectiveness of the Registration Statement; (e) equitable relief to enjoin Jupiter Wellness from further breaches of the Underwriting agreement; (f) specific performance of the Underwriting Agreement; and (g) equitable extension of the Lock-Up Period to ensure that Aegis obtains the full term of the Lock-Up Period plus such additional time as the court may deem appropriate to remedy periods of breach of the Lock-Up Period.

**Second Cause of Action (Breach of Contract)**

50.     Aegis repeats and incorporates the foregoing allegations as if restated in full in this paragraph.

51.     The Underwriting Agreement is valid and enforceable agreement formed by the parties under New York law that Aegis has dutifully performed in good faith.

52.     Jupiter Wellness' actions outlined above constitute a knowing, purposeful and material breach of the Underwriting Agreement that has caused and continues to cause Aegis substantial and irreparable harm.

53.     The Underwriting Agreement permits the recovery of reasonable attorneys' fees and expenses to the prevailing party in any action necessary to enforce the terms of the Underwriting Agreement.

54.     Jupiter Wellness did not request, and Aegis did not provide, any written consent or waiver for Jupiter Wellness to enter into any of the Violating Transactions.

55.     Jupiter Wellness breached the Underwriting Agreement by entering into the Violating Transactions without obtaining Aegis' consent or waiver.

56.     As a direct and proximate cause of Jupiter Wellness' breaches, Aegis suffered damages that far exceed the jurisdictional amount, and that are preliminarily believed to be in excess of $1,000,000.

**Relief Requested**

WHEREFORE, Aegis Capital Corp., by counsel, requests that this Court grant it the following relief:

(1) Enter an order declaring that Jupiter Wellness' entry into the Violating Transactions breached the Lock-Up Period and the Underwriting Agreement due to Jupiter Wellness' failure to obtain Aegis' written consent and waiver.

(2) Preliminary and permanent injunctive relief against further breaches of the Underwriting Agreement, including the following: (i) rescind the Greentree loan agreement,

promissory note and warrants; (ii) rescind the L&H loan agreement, promissory note and warrants; (iii) rescind the W&B option agreement and, to the extent the issuance of such options are concerned, the W&B consulting agreement; (iv) prevent Jupiter Wellness from (a) taking any actions to maintain the effectiveness of the Registration Statement; (b) effecting any issuance of shares of common stock under the Greentree or L&H loan agreement, promissory note or warrants or the W&B option agreement, including issuing additional securities thereunder or adjusting the terms thereof; (c) effecting, permitting or registering any transfer of the Greentree or L&H loan agreement, promissory note or warrants or the W&B option agreement to third parties on the books of Jupiter Wellness; (v) require specific performance of the Underwriting Agreement and (vi) grant an equitable extension of the Lock-Up Period to ensure that Aegis obtains the full term of the Lock-Up Period plus such additional time as the court may deem appropriate to remedy periods of breach of the Lock-Up Period.

(3) Enter judgment in Aegis' favor for all damages proven at trial for Jupiter Wellness' breach of the Underwriting Agreement and for all costs and attorneys' fees incurred in the preparation and prosecution of this action; and

(4) Grant all such further relief as this Court deems just and right.

Dated: New York, New York
June 23, 2022

JFB LEGAL, PLLC

By /s/ John F. Baughman

John F. Baughman (JB6825)
299 Broadway – Suite 1816
New York, NY 10007
(212) 548-3212
Email:  jbaughman@jfblegal.com

KAUFMAN & CANOLES, P.C.

Stephen E. Noona (VSB No. 25367)
(*pro hac vice* forthcoming)
Clark J. Belote (VSB No. 87310)
(*pro hac vice* forthcoming)
150 W. Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3000
(888) 360-9092 Facsimile
Email:  senoona@kaufcan.com
Email:  cjbelote@kaufcan.com

*Attorneys for Aegis Capital Corp.*